**Opinion issued April 14, 2026**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-25-01056-CV**

————————————

## IN THE INTEREST OF Z.A.A., A CHILD

———————————————————————————————————

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Case No. 2023-02333J**

———————————————————————————————————

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, father, challenges the trial court's order, entered after a hearing, terminating his parental rights to his minor child, Z.A.A.,[2] and continuing the sole managing conservatorship of Z.A.A. by appellee, the

---

[1]     *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

[2]     At the time father's parental rights were terminated, Z.A.A. was six years old.

Department of Family and Protective Services ("DFPS").[3] In two issues, father contends that the evidence is legally and factually insufficient to support the trial court's findings that DFPS made reasonable efforts to return Z.A.A. to father[4] and termination of father's parental rights was in the best interest of Z.A.A.[5]

We affirm.

## Background

On October 13, 2023, DFPS filed a petition seeking termination of father's parental rights to Z.A.A. and managing conservatorship of Z.A.A.[6] After a bench trial, the court, on December 4, 2024, signed an order appointing DFPS as the sole managing conservator of Z.A.A., but it did not terminate the parental rights of father at that time. Instead, it allowed father to have supervised visitation of Z.A.A.[7] Father was ordered to pay child support in the amount of $227.64. Z.A.A. was placed in the care of his maternal great grandfather, with whom he had been living during the case.[8]

---

[3] The trial court also terminated the parental rights of Z.A.A.'s mother, but she is not a party to this appeal.

[4] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N)(i).

[5] *See id.* § 161.001(b)(2).

[6] DFPS also sought managing conservatorship of Z.A.A.'s younger half-brother, and termination of mother's parental rights to both children. Father is not the biological father of Z.A.A's younger brother.

[7] The trial court did not appoint father as a possessory conservator of Z.A.A., finding that it would not be in the child's best interest to do so.

[8] Z.A.A.'s younger brother was also placed with their great grandfather.

2

On May 8, 2025, DFPS filed a first amended motion to modify conservatorship and for termination of father's parental rights to Z.A.A.[9] The first amended motion sought to have Z.A.A.'s great grandfather appointed as his sole managing conservator and for father's parental rights to be terminated. A hearing on DFPS's first amended motion was held on November 11, 2025.

### DFPS Caseworker Darrington

Iris Darrington testified that she was the conservatorship caseworker assigned to Z.A.A., and DFPS had previously been granted sole managing conservatorship of the child.[10] Z.A.A. was living with his great grandfather, with whom he had been living since April 2024, along with his younger brother. Z.A.A.'s great grandfather met his needs and had the financial means to care for Z.A.A. DFPS, through its motion to modify, sought to have Z.A.A.'s great grandfather appointed as the sole managing conservator of the child and termination of father's parental rights to Z.A.A. so that the great grandfather could adopt Z.A.A. DFPS did not have any concerns about Z.A.A. residing with his great grandfather. Z.A.A.'s great

---

[9] DFPS also sought termination of mother's parental rights to Z.A.A. and Z.A.A.'s younger brother. Mother signed an "Irrevocable Affidavit of Voluntary Relinquishment of Parental Rights to [DFPS]" on April 30, 2025.

[10] Darrington testified that Z.A.A. entered DFPS's care after it received allegations of neglectful supervision of the child by mother and father. It was alleged that mother and father were selling narcotics "out of a hotel" and Z.A.A. was in a car with father's relatives when the relatives were arrested. Narcotics were found the car, and Z.A.A. was not in a car seat.

grandfather had been the only relative in Z.A.A.'s life that had provided him with stability.

Darrington further testified that Z.A.A.'s great grandfather had a "backup plan" if "something were to happen to him" before Z.A.A. turned eighteen years old. The great grandfather had a "big supportive family," and a family member who was caring for another one of Z.A.A.'s siblings had agreed to care for Z.A.A. should something happen to the great grandfather. That family member was already a licensed caregiver with a foster agency.

According to Darrington, she believed that it was in Z.A.A.'s best interest for father's parental rights to be terminated because Z.A.A. had lived with his great grandfather for the majority of his life and the great grandfather planned to adopt him.[11] While Z.A.A. lived with his great grandfather, his behavior had improved.

DFPS was requesting the termination of father's parental rights based on "his abandonment" of Z.A.A. Father had not seen Z.A.A. since December 2024, even though Z.A.A.'s great grandfather and father had an amicable relationship, and in the past, the great grandfather would allow father to stop by and see Z.A.A.

As to father, Darrington explained that father had a "criminal history involving drugs and domestic violence," and he had been incarcerated for different periods of time since Z.A.A. had entered DFPS's care. For instance, father was

---

[11] The great grandfather also planned to adopt Z.A.A.'s younger brother.

4

incarcerated in October 2023 for the offense of assault of a family member, and he was released from incarceration in May 2024. Father was again incarcerated in October 2024 for about two months. In December 2024, father was released from incarceration and remained free until September 2025 when he was incarcerated for a few weeks. Darrington noted that from December 2024 until September 2025, father did not have any contact with Z.A.A. and did not visit the child, even though he was not incarcerated during that time. After being released from incarceration in either September 2025 or October 2025, father had not had any contact with Z.A.A. Father had not provided any child support for Z.A.A.[12]

Darrington testified that DFPS had created a Family Service Plan ("FSP") for father,[13] but it had been unable to contact father. DFPS had attempted to contact father using the telephone numbers it had for him, but father did not respond. DFPS also contacted father's mother, but his mother told DFPS that she did not have any contact with him. The telephone number that father's mother gave DFPS for father was disconnected. DFPS had also tried searching social media and using previous addresses it had for father to attempt to locate him. And DFPS had contacted father's

---

[12] At another point in her testimony, Darrington testified that father had given money to Z.A.A.'s great grandfather in the past, but not consistently.

[13] A copy of father's FSP was not admitted into evidence at trial.

parole officer to attempt to get father's contact information, but she did not have any contact information that DFPS had not already tried using.[14]

According to Darrington, father had not participated in any of the requirements of his FSP, and he had not addressed his narcotics issues or issues with domestic violence to show that he could provide Z.A.A. with a safe and stable home.[15]  Darrington testified that DFPS had attempted to contact father so that he could participate in the requirements of his FSP and DFPS could "make a reasonable effort to reunify him with [Z.A.A.]"  Father had not responded to any attempted contact from DFPS since May 2024.[16]  Before May 2024, DFPS had last heard from father in January 2024 when Darrington was able to visit father and discuss his FSP with him.

As to termination of father's parental rights, Darrington explained that father had been absent for the majority of the case, and he had failed to demonstrate a "lifestyle change that would ensure the safety and well-being" of Z.A.A.  Father had

---

[14]  Darrington noted that father was personally served with DFPS's first amended motion on September 10, 2025, but she had been unable to get ahold of father.

[15]  Darrington testified that father had never cared for Z.A.A. on his own.

[16]  In May 2024, father sent a text message to DFPS stating that he was in favor of Z.A.A.'s great grandfather being named permanent managing conservator of Z.A.A. This occurred before the trial court signed its December 4, 2024 order appointing DFPS as the sole managing conservator of Z.A.A.

failed to support and maintain contact with Z.A.A. for over six months and had not participated in the requirements of his FSP.

### Z.A.A.'s Great Grandfather

Z.A.A.'s great grandfather testified that he had cared for Z.A.A. before the case began "off and on," but Z.A.A. had been living with him consistently for a year and a half. Z.A.A.'s behavior had improved while living with his great grandfather.

According to Z.A.A.'s great grandfather, father had not seen Z.A.A. since December 2024, and when he did see Z.A.A., he would just ride his bicycle by the great grandfather's home and "holler at" Z.A.A. He did not come into the house. Sometimes the great grandfather saw father at a distance in the neighborhood. Z.A.A. never asked to see father.

Z.A.A.'s great grandfather testified that he wanted to adopt Z.A.A.,[17] and he had worked with DFPS to "come up with a backup caregiver in case something happen[ed] with [him] and [he was] not able to care for [Z.A.A.] until [he] turn[ed] 18" years old.[18]

---

[17] The great grandfather also wanted to adopt Z.A.A.'s younger brother.

[18] DFPS kinship caseworker Marina Muse testified that she spoke with the "backup caregiver" for Z.A.A. and she had agreed to the role.

*Child Advocates Volunteer*

Traykevia Gibbs, a volunteer with Child Advocates, Inc. ("Child Advocates"), testified that she was assigned to Z.A.A.'s case and she believed it was in the best interest of Z.A.A. for father's parental rights to be terminated based off father's lack of effort in the case. According to Gibbs, father had made little to no effort to be involved with Z.A.A. or to support the child. Further, Z.A.A.'s great grandfather had been the primary caregiver for Z.A.A. for more than a year. Gibbs believed that the great grandfather was able to meet all of Z.A.A.'s needs, and she did not have any concerns with the care Z.A.A.'s great grandfather had been providing for the child. Gibbs had spoken to the great grandfather's backup caregiver and believed that the great grandfather and the backup caregiver had a "solid plan in place."[19] The backup caregiver would also support Z.A.A.'s great grandfather in case of an emergency.

Gibbs noted that in addition to Z.A.A. and Z.A.A.'s younger brother, three other minor children[20] and great grandfather's adult child also lived in the great grandfather's home. The great grandfather had been able to meet the needs of

---

[19]    Gibbs testified that Z.A.A.'s great grandfather was eighty or eighty-one years old.

[20]    As to the three other minor children, Gibbs noted that they were not living with Z.A.A.'s great grandfather because of a court order and that meant that mother could come and take the children at any point. Mother was not allowed to remove either Z.A.A. or Z.A.A.'s younger brother from the great grandfather's home.

8

everyone living in his home. Gibbs believed that Z.A.A.'s great grandfather would be protective of Z.A.A.

As to father, Gibbs testified that she had tried to contact father throughout the case on a monthly basis. Father had not been responsive though, and because of that, Gibbs had never been able to speak to father.

### Father's Criminal History

The trial court admitted into evidence a copy of a trial court judgment showing that on March 28, 2024, father was adjudicated guilty of the felony offense of possession of a controlled substance, weighing more than four grams but less than 200 grams,[21] and his punishment was assessed at confinement for two years. The offense occurred on January 26, 2022, while Z.A.A. was in his care. The trial court also admitted into evidence a copy of a trial court order of deferred adjudication showing that on March 24, 2015, father was placed on community supervision for a period of one year related to the misdemeanor offense of assault of a family member.[22] Finally, the trial court admitted into evidence a copy of a trial court judgment showing that on August 31, 2016, father was convicted of the

---

[21]     *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(a), (d).

[22]     *See* TEX. PENAL CODE ANN. § 22.01.

misdemeanor offense of theft,[23] and his punishment was assessed at confinement for six days.

### *Permanency Report*

The trial court admitted into evidence a copy of a DFPS permanency report filed on October 31, 2025 in the trial court. At the time the report was written, Z.A.A. was six years old, and he had been living with his great grandfather since April 2024. Z.A.A. had siblings that also lived in the home as well as an uncle—his great grandfather's adult child. Z.A.A. liked playing with Legos, remote control cars, and action figures. Z.A.A. was "developmentally on target" and in the first grade. Z.A.A. participated in behavioral therapy on a weekly basis and had been diagnosed with disruptive mood dysregulation disorder ("DMDD"). While in the care of his great grandfather, Z.A.A. had medical checkups, a vision examination, and had visited the dentist. The permanency report stated that DFPS's primary goal for Z.A.A. was adoption by his great grandfather.

As to father, the report explained that he had not had any contact with DFPS since DFPS was named sole managing conservator of Z.A.A. in December 2024.

### Standard of Review

A parent's right to "the companionship, care, custody, and management" of his child is a constitutional interest "far more precious than any property right."

---

[23]     *See id.* § 31.03(a), (e).

*Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [his] child[] . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment for the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore

12

the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

### Termination of Father's Parental Rights

In his first issue, father argues that the trial court erred in terminating his parental rights to Z.A.A. because the evidence is legally and factually insufficient to support the trial court's finding that DFPS made reasonable efforts to return Z.A.A. to father. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N)(i). In his second issue, father argues that the trial court erred in terminating his parental rights to Z.A.A. because the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in the best interest of Z.A.A. *See id.* § 161.001(b)(2).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is

13

in the best interest of the child. *See id.* § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *See id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## A.    Reasonable Efforts

In his first issue, father argues that the evidence is legally and factually insufficient to support the trial court's finding that DFPS made reasonable efforts to return Z.A.A. to father, as required by Texas Family Code section 161.001(b)(1)(N)(i), because a court-ordered FSP was "not established, []or in effect, after [f]ather was personally served in September 2025 [with DFPS's first amended motion to modify conservatorship and for termination of father's parental rights to Z.A.A]." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N)(i).

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that a parent has "constructively abandoned [his] child who has been in the permanent or temporary managing conservatorship of [DFPS] for not less than six months," DFPS made reasonable efforts to return the child to the parent, the parent did not regularly visit or maintain significant contact

14

with the child, and the parent demonstrated an inability to provide the child with a safe environment. *Id.* § 161.001(b)(1)(N). Father argues that the evidence was insufficient to show that DFPS made reasonable efforts to return Z.A.A. to father because father did not receive a court-ordered FSP after father was personally served with DFPS's first amended motion. *See In re Y.T.A.-D.*, Nos. 14-24-00161-CV, 14-24-00163-CV, 2024 WL 3715392, at *7 (Tex. App.—Houston [14th Dist.] Aug. 8, 2024, no pet.) (mem. op.) (this element focuses on DFPS's conduct).

An FSP is designed to reunify a parent with a child who has been removed from a parent's care by DFPS. *In re G.K.G.A.*, No. 01-16-00996-CV, 2017 WL 2376534, at *5 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.). Thus, DFPS's implementation of an FSP is generally considered a reasonable effort to return a child to the parent as required by Texas Family Code section 161.001(b)(1)(N)(i). *See In re M.N.M.*, 708 S.W.3d 321, 329 (Tex. App.—Eastland 2025, pet. denied). However, evidence of an FSP is not the exclusive means of establishing that DFPS made reasonable efforts to return a child. *See id.*; *In re J.G.S.*, 550 S.W.3d 698, 704–05 (Tex. App.—El Paso 2018, no pet.); *see also In re Y.T.A.-D.*, 2024 WL 3715392, at *7 ("[I]mplementing a service plan is not the exclusive means of establishing that reasonable efforts were made."). Ultimately, "the issue is whether [DFPS] made reasonable efforts, not ideal efforts." *In re J.A.*,

No. 04-20-00242-CV, 2020 WL 5027663, at \*2 (Tex. App.—San Antonio Aug. 26, 2020, no pet.) (mem. op.) (internal quotations omitted).

Here, the record shows that DFPS made reasonable efforts to return Z.A.A. to father. DFPS made consistent efforts to contact father throughout the case, which father rejected. DFPS caseworker Darrington testified that she had engaged in extensive efforts to reach father. DFPS last heard from father in May 2024, when father contacted DFPS via text message, stating that he was in favor of Z.A.A.'s great grandfather being named permanent managing conservator of Z.A.A. According to Darrington, during the case, DFPS had tried using the telephone numbers that it had for father in order to reach him, and it had contacted father's mother, who told DFPS that she had not had any contact with him. DFPS also tried using the telephone number that father's mother had for father to contact him, but that number was disconnected. Further, DFPS used social media to search for father and used previous addresses to attempt to locate him. And DFPS had contacted father's parole officer to attempt to get father's contact information, but the officer did not have any contact information that DFPS had not already tried using. *See In re Y.T.A.-D.*, 2024 WL 3715392, at \*8 (explaining record reflected DFPS made reasonable efforts to return children to parent, where parent "consistently rejected [DFPS's] attempts to contact her and engage her participation"); *In re L.C.M.*, 645 S.W.3d 914, 922 (Tex. App.—El Paso 2022, no pet.) (noting, in holding evidence

16

sufficient to support trial court's finding that DFPS made reasonable efforts to return child to parent, record showed DFPS attempted to engage with parent multiple times); *see also In re M.B.*, No. 14-25-00418-CV, --- S.W.3d ---, 2025 WL 3275376, at *8 (Tex. App.—Houston [14th Dist.] Nov. 25, 2025, no pet.) ("Although [parent] challenges . . . the reasonable efforts of [DFPS], it is unclear what additional actions [DFPS] could have taken to return [the child] when [parent] refused to . . . communicate."); *Gamez v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-09-00190-CV, 2009 WL 4456150, at *7 (Tex. App.—Austin Dec. 1, 2009, no pet.) (mem. op.) (concluding parent's failure to provide contact information and DFPS's attempts to find her while case was pending supported "reasonable efforts" element).

Additionally, we note that it is undisputed that DFPS had placed Z.A.A. in the care of one of his family members. *See, e.g., D. F. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-25-00738-CV, --- S.W.3d. ---, 2026 WL 482451, at *9 (Tex. App.—Austin Feb. 20, 2026, no pet.) (explaining after children removed from parent's care, they "were placed with family members throughout th[e] case," which constituted "sufficient evidence to support the trial court's finding that [DFPS] made reasonable efforts to return the children to [parent]"); *A. D. v. Tex. Dep't of Fam. & Protective Servs.*, 673 S.W.3d 704, 714 (Tex. App.—Austin 2023, no pet.) (noting DFPS "made attempts to place [child] with a family member before placing him in

17

foster care when no other viable family options were available"); *In re L.C.M.*, 645 S.W.3d 914, 921–22 (Tex. App.—El Paso 2022, no pet.) ("[DFPS's] efforts to place the child with relatives constitutes legally and factually sufficient evidence that reunification was attempted."); *see also In re G.C.S., Jr.*, 657 S.W.3d 114, 132 (Tex. App.—El Paso 2022, pet. denied) (returning-child-to-parent element does not necessarily require proof that child was physically delivered to parent).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that DFPS made reasonable efforts to return Z.A.A. to father. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N)(i). And viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that DFPS made reasonable efforts to return Z.A.A. to father. *See id.*

Further, we conclude that the trial court could have reconciled any disputed evidence in favor of finding that DFPS made reasonable efforts to return Z.A.A. to father. *See id.* And any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that DFPS made reasonable efforts to return Z.A.A. to father. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that DFPS made reasonable efforts to return Z.A.A.

18

to father as required for termination of father's parental rights under Texas Family Code section 161.001(b)(1)(N). *See id.*

We overrule father's first issue.

## B.    Best Interest

In his second issue, father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in the best interest of Z.A.A. because the *Holley* factors were either "neutral" or weighed against termination of father's rights. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The best-interest analysis evaluates the best interest of the child. *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *20 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). It is presumed that the prompt and permanent placement of the child in a safe environment is in his best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d at 383.

There is also a strong presumption that the child's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Thus, we strictly scrutinize termination proceedings in favor of the parent. *See In re M.A.A.*, 2021 WL 1134308, at *20; *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.).

In determining whether the termination of father's parental rights was in the best interest of Z.A.A., we may consider several factors, including: (1) the desires of Z.A.A.; (2) the current and future physical and emotional needs of Z.A.A.; (3) the current and future emotional and physical danger to Z.A.A.; (4) the parental abilities of the parties seeking custody of Z.A.A.; (5) whether programs are available to assist those parties; (6) plans for Z.A.A. by the parties seeking custody; (7) the stability of the proposed placement for Z.A.A.; (8) father's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for father's acts or omissions.[24] *See Holley*, 544 S.W.2d at 371–72; *In re L.M.*, 104 S.W.3d at 647. We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE ANN. § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018); *In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at *6 & n.4 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

We note that the above listed factors are not exhaustive, and DFPS need not prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.— Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The absence of evidence about some of the factors does not preclude a fact finder from reasonably

---

[24] Much of the evidence discussed below applies to multiple factors.

forming a strong conviction or belief that termination is in a child's best interest. *In re C.H.*, 89 S.W.3d at 27; *In re J. G. S.*, 574 S.W.3d 101, 122 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the child's best interest. *See In re C.H.*, 89 S.W.3d at 27; *see also In re J. G. S.*, 574 S.W.3d at 122.

The same evidence of acts and omissions used to establish grounds for termination under Texas Family Code section 161.001(b)(1) may also be relevant to determining the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647. The trial court is given wide latitude in determining the best interest of the child. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

### 1. Z.A.A.'s Desires

When father's parental rights were terminated, Z.A.A. was six years old. Although there was no specific evidence of Z.A.A.'s desires, when a child is young, a fact finder may consider evidence that the child is bonded with his foster parent, receives good care in his current placement, and has spent minimal time with his parent. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *18 (Tex.

App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (in determining sufficient evidence to support best-interest finding, considering children bonded with foster family, foster parents wanted children to continue to live with them, and foster parents meeting children's needs).

At the time of trial, Z.A.A. had been living in his placement with his great grandfather for more than a year and a half. Z.A.A.'s younger brother also lived with his great grandfather, and it is undisputed that Z.A.A.'s great grandfather was meeting his needs. Z.A.A.'s behavior had improved while in his great grandfather's care. According to DFPS caseworker Darrington, Z.A.A.'s great grandfather had been the only relative in Z.A.A.'s life that provided him with stability, and the great grandfather wanted to adopt Z.A.A., along with Z.A.A.'s younger brother. *See In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *20 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.) (considering evidence children doing well in placement and foster parents meeting children's needs); *In re M.L.R-U., Jr.*, 517 S.W.3d 228, 238 (Tex. App.—Texarkana 2017, no pet.) (considering evidence foster family provided safe and healthy environment when determining children's desires). Father had not seen Z.A.A. since December 2024, and according to his great grandfather, Z.A.A. did not ask to see father.

22

## 2. Current and Future Physical and Emotional Danger

A parent's criminal history is relevant in analyzing the present and future emotional and physical danger to a child and whether a parent is capable of providing a safe and stable home for his child. *See In re J.S.B.*, Nos. 01-17-00480-CV, 01-17-00481-CV, 01-17-00484-CV, 2017 WL 6520437, at *18–19 (Tex. App.— Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.); *In re T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *6 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (evidence of parent's criminal history may support trial court's finding termination of parental rights in children's best interest). Notably, "[a]s a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

DFPS caseworker Darrington testified that father had a "criminal history involving drugs and domestic violence," and he had been incarcerated at different times since Z.A.A. had been in DFPS's care. *See In re D.J.G.*, No. 01-22-00870-CV, 2023 WL 3513143, at *23 (Tex. App.—Houston [1st Dist.] May 18, 2023, no pet.) (mem. op.) (illegal narcotics use by parent may constitute evidence of current and future danger to child); *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied) (evidence of parent's past misconduct can be used to measure parent's future conduct). According to Darrington, father was incarcerated in October 2023 for the

offense of assault of a family member, and he was released from incarceration in May 2024. Father was again incarcerated in October 2024 for about two months. In December 2024, father was released from incarceration and remained free until September 2025 when he was incarcerated for a few weeks. *See In re L.J.H.*, No. 05-21-00183-CV, 2021 WL 4260769, at \*16 (Tex. App.—Dallas Sept. 20, 2021, no pet.) (mem. op.) ("A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being."); *see also In re S.H.*, No. 01-22-00255-CV, 2022 WL 17254956, at \*18 (Tex. App.—Houston [1st Dist.] Nov. 29, 2022, pet. denied) (mem. op.) ("Criminal activity that exposes a parent to the potential for incarceration is relevant to the trial court's best-interest determination."); *In re T.L.S.*, 2012 WL 6213515, at \*6 (evidence of parent's criminal history may support trial court's finding termination of parental rights in children's best interest).

Additionally, the trial court admitted into evidence a copy of a trial court judgment showing that on March 28, 2024, father was adjudicated guilty of the felony offense of possession of a controlled substance, weighing more than four grams but less than 200 grams, and his punishment was assessed at confinement for two years. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(a), (d). The offense occurred on January 26, 2022, while Z.A.A. was in father's care.

The trial court also admitted into evidence a copy of a trial court order of deferred adjudication showing that on March 24, 2015, father was placed on community supervision for a period of one year related to the misdemeanor offense of assault of a family member. *See* TEX. PENAL CODE ANN. § 22.01; *see also* TEX. FAM. CODE ANN. § 263.307(b)(7) (in determining whether parent able to provide child with safe environment, considering history of abusive and assaultive conduct by child's family members); *Clements v. Haskovec*, 251 S.W.3d 79, 87 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.) (in parental-termination cases, evidence parent in past engaged in abusive conduct permits inference parent will continue behavior in future) . Finally, the trial court admitted into evidence a copy of a trial court judgment showing that on August 31, 2016, father was convicted for the misdemeanor offense of theft, and his punishment was assessed at confinement for six days. *See* TEX. PENAL CODE ANN. § 31.03(a), (e); *see also In re K.S.*, 420 S.W.3d 852, 856 (Tex. App.—Texarkana 2014, no pet.) ("[The] past is [a] prologue[;] there is a great likelihood that [a parent's] conduct w[ill] continue into the future. Actions speak louder than words.").

**3. Current and Future Physical and Emotional Needs, Parental Abilities, and Stability of Proposed Placement**

   a.   *Z.A.A.'s Needs and Current Placement*

At the time of trial, Z.A.A. had been in his great grandfather's care for more than a year and a half.[25] Z.A.A. lived with his siblings in the home as well, including his younger brother. A DFPS permanency report, a copy of which was admitted into evidence at trial, stated that Z.A.A. liked playing with Legos, remote control cars, and action figures. Z.A.A. was "developmentally on target" and in the first grade. Z.A.A. participated in behavioral therapy on a weekly basis and had been diagnosed with DMDD. *See In re K.A.C.*, 594 S.W.3d 364, 376 (Tex. App.—El Paso 2019, no pet.) (considering child's foster placement was able to provide for child's therapeutic needs). While in the care of his great grandfather, Z.A.A. had medical checkups, a vision examination, and had visited the dentist. *See In re M.A.A.*, 2021 WL 1134308, at *23 (child's basic needs include medical and dental care).

According to DFPS caseworker Darrington, Z.A.A.'s great grandfather had been the only relative in Z.A.A.'s life that had provided him with stability, and Child Advocates volunteer Gibbs believed that Z.A.A.'s great grandfather was meeting the child's needs and was protective of him. *See Adams v. Tex. Dep't of Fam. & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no

---

[25] Z.A.A.'s great grandfather testified that prior to Z.A.A. being placed in DFPS's care, he had taken care of Z.A.A. "off and on" throughout the child's life.

pet.) (in children's best interest to be raised in consistent, stable, and nurturing environment).

Z.A.A.'s great grandfather noted that Z.A.A.'s behavior had improved while Z.A.A. had been in his care, and he wanted to adopt Z.A.A., along with Z.A.A.'s younger brother. *See In re T.M.R.*, No. 13-21-00144-CV, 2021 WL 4998438, at *7 (Tex. App.—Corpus Christi–Edinburg Oct. 28, 2021, no pet.) (mem. op.) ("A factfinder may consider the consequences of [the] failure to terminate parental rights and may also consider that the child's best interest may be served by termination so that adoption may occur."); *In re L.W.*, 2019 WL 1523124, at *23 (in holding evidence sufficient to support trial court's best-interest finding, considering children were placed in adoptive home with foster parents who wanted children to continue living with them). Z.A.A.'s great grandfather also had a "backup caregiver" in place for Z.A.A. if something happened to the great grandfather before Z.A.A.'s turned eighteen years old.

b. *Father*

A child's need for a safe and stable home is the paramount consideration in assessing the best interest of the child. *See* TEX. FAM. CODE ANN. § 263.307(a) (prompt and permanent placement of child in safe environment presumed to be in child's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable

27

home is unable to provide for child's emotional and physical needs); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.). Here, there is no evidence in the record that father is able to provide Z.A.A. with a safe and stable home. *See In re E.T.*, No. 02-25-00545-CV, 2026 WL 179594, at *8 (Tex. App.—Fort Worth Jan. 22, 2026, no pet.) (mem. op.) (trial court could reasonably infer from parent's history of repeated incarcerations that he could not provide child with stable home).

Further, there is no evidence in the record that father wanted to be involved in Z.A.A.'s life. Father had not seen Z.A.A. since December 2024—for almost a year at the time of trial—even though the trial court had permitted father to have supervised visitation with Z.A.A. in its December 4, 2024 order. He had also not responded to DFPS's attempts or Child Advocates' attempts to contact him. *See In re K.S.*, 420 S.W.3d at 855–56 (lack of contact between parent and child weighed in favor of termination because it showed "lack of resolve" or disinterest in parenting child); *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (trial court may measure parent's future conduct by past conduct); *see also In re S.H.*, 2022 WL 17254956, at *19 (considering parent was "an inconsistent adult figure" in child's life in holding evidence sufficient to support trial court's best interest finding (internal quotations omitted)).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that

termination of father's parental rights was in the best interest of Z.A.A. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of father's parental rights was in the best interest of Z.A.A. *See id.* We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of father's parental rights was in Z.A.A.'s best interest, or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of Z.A.A. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of father's parental rights was in the best interest of Z.A.A. *See id.*

We overrule father's second issue.

## Conclusion

We affirm the order of the trial court.


Kristin Guiney
Justice

Panel consists of Chief Justice Adams and Justices Guerra and Guiney.